***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rideout and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. The Full Commission adopts the Opinion and Award of Deputy Commissioner Rideout with minor modifications.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between plaintiff and defendant.
 3. The carrier liable on the risk is correctly named in this action. *Page 2 
4. Plaintiff's average weekly wage is $746.00.
5. Plaintiff sustained an injury on or about May 8, 2002, with the exact date to be determined by the Industrial Commission.
6. The injury arose out of and in the course and scope of employment and is compensable.
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff is a 63 year-old female, who has completed the 12th grade of high school and 4 years of college. After college, plaintiff earned a certification from a medical technical school and worked with various medical providers. Plaintiff has worked for Mutual of New York selling insurance products, financial planning and speaking at financial seminars. She has also worked in the banking industry where she was a financial analyst and actively traded financial instruments. Plaintiff has been employed by defendant, and its predecessor First Union, as retail financial specialist for 15 years.
2. On May 8, 2002, while employed as a financial analyst for defendant, plaintiff was involved in a motor vehicle accident while traveling to a meeting in Windsor, North Carolina on behalf of defendant. Plaintiff suffered multiple soft tissue injuries. Plaintiff has received ongoing temporary total disability payments from the time of plaintiff's injury.
3. Plaintiff was transported to Washington County Hospital with complaints of neck and left hip pain, and was diagnosed with an intra-abdominal injury. She was then transported to *Page 3 
Pitt Memorial Hospital, where she was diagnosed with bilateral knee contusions and blunt abdominal trauma.
4. After plaintiff's release from the hospital, plaintiff followed up with Dr. Richard Tate on May 13, 2002 and began a conservative course of treatment, primarily for complaints of back and hip pain, until Dr. Tate referred plaintiff to an orthopedist.
5. On September 12, 2002, plaintiff began treatment with Dr. Wilford Gibson and Dr. Joann W. Dervay of Atlantic Orthopedics, at which time Dr. Gibson initiated a conservative course of care for plaintiff's complaints of low back and left hip pain. Dr. Gibson also referred plaintiff to a neurologist for treatment of a possible closed head injury.
6. On October 8, 2002, Dr. Gibson opined that plaintiff was at maximum medical improvement (MMI) with respect to her knees and hips, and plaintiff was released from care with no further physical therapy or other treatment required. On January 14, 2003, plaintiff returned to see Dr. Gibson, who subsequently recommended a functional capacity evaluation.
7. On April 15, 2003, plaintiff underwent a functional capacity evaluation, which revealed that plaintiff could return to work in a light classification category with only positional tolerance restrictions for right pivot, twisting, and crouching activities.
8. On May 7, 2003, Dr. Gibson again determined that plaintiff was at MMI and could return to light duty work with restrictions of no stair climbing, no stooping, no kneeling, occasional bending, and limited lifting. Dr. Gibson assigned plaintiff a five percent (5%) impairment rating to her lower extremity and a zero percent (0%) impairment to her back. Dr. Gibson advised plaintiff to follow up as needed.
9. On July 30, 2004, plaintiff returned to Dr. Gibson with complaints of hip pain. X-rays did not show any progression or worsening of plaintiff's hip condition. Dr. Gibson stated *Page 4 
that there were no invasive treatments or surgical interventions anticipated in the near or foreseeable future, and assigned a ten percent (10%) whole person impairment for plaintiff's hip.
10. In October 2004, plaintiff began unauthorized treatment with Dr. Edward Isaacs, primarily for complaints of left hip pain. At the time that plaintiff began treatment with Dr. Isaacs, she had been receiving authorized orthopedic care from Dr. Gibson and Dr. Dervay for over two years, as well as authorized treatment by Dr. Gualtieri for her brain injury.
11. Plaintiff last saw Dr. Isaacs' on July 15, 2005, at which time plaintiff continued to complain of both low back and left hip pain. Plaintiff resumed treatment with Dr. Gibson on July 15, 2005 with the same complaint that plaintiff had when she last saw Dr. Isaacs.
12. On December 9, 2005, plaintiff presented to Dr. Gibson with complaints of increased pain in her left hip. Dr. Gibson diagnosed plaintiff with left hip chondrolysis with post-traumatic osteoarthritis and recommended aspirating the hip under fluoroscopy and performing steroid injections.
13. On January 13, 2006, Dr. Gibson noted that plaintiff responded well to the aspiration of her hip and the injection, but that plaintiff will more likely than not require a hip replacement in the near future.
14. Dr. Gibson continues to recommend a left hip replacement for plaintiff, which defendants have approved. Dr. Gibson opined that after plaintiff undergoes the hip replacement surgery she would not need to treat with Dr. Isaacs.
15. On January 9, 2003, plaintiff began treating with Dr. Armistead Williams for her closed head injury. She complained of headaches, cognitive impairment, mood swings, and depression. Plaintiff treated with Dr. Williams until April 16, 2003, when she was referred to a neuropsychiatrist. *Page 5 
16. In July 2003, plaintiff began treating with Dr. Gualtieri of North Carolina Neuropsychiatry. On April 22, 2004, Dr. Gualtieri determined that plaintiff was at MMI with respect to her brain injury, and assigned an impairment rating of fifteen percent (15%).
17. On May 25, 2004, Dr. Gualtieri determined that plaintiff was able to return to work with restrictions in a job that did not involve high stress and multi-tasking and would allow plaintiff to work flexible hours, possibly beginning part-time rather than full time.
18. On July 28, 2005, plaintiff returned to Dr. Williams, at which time Dr. Williams indicated in a letter to Dr. Gibson that there was no evidence of a neurological reason for plaintiff's left hip pain, but that plaintiff exhibited cognitive impairment in the setting of depression, attention disorder, and head injury.
19. In March 2006, Dr. Gualtieri reiterated his opinion that plaintiff could return to work with the previously stated restrictions. Dr. Gualtieri opined that plaintiff is at MMI for her brain injury/post-concussive syndrome and is capable of productive employment, in a position with flexible hours and a relatively stress-free environment that doesn't require multi-tasking.
20. Dr. Gualtieri opined that plaintiff's chronic pain is affecting her current cognitive condition and that her restrictions could be reduced if her emotional state continues to improve as it had over the past year. Dr. Gualtieri testified that plaintiff's psychological and cognitive problems would virtually disappear if her physical condition improved. Dr. Gualtieri further opined that once plaintiff's physical conditions resolve, any remaining psychological issues and disability may actually be related to pre-existing conditions and not to the May 8, 2002 accident.
21. Defendants scheduled plaintiff to undergo an independent medical examination by Dr. Robert P. Hart of the VCU Medical Center on February 7, 2006. Plaintiff cancelled that appointment, but was eventually examined on March 23, 2006. Dr. Hart found that plaintiff was *Page 6 
capable of consulting work or other activities such as research that allow some degree of self-pacing and involve a limited amount of multi-tasking under pressure. Dr. Gualtieri agreed with Dr. Hart's conclusions regarding plaintiff's work capabilities. 22. There is no indication in any of plaintiff's vocational rehabilitation notes since December 2003 to indicate that plaintiff will not be capable of obtaining suitable employment within her restrictions. There has been no testimony from any of plaintiff's treating physicians that plaintiff will not be able to return to suitable employment within her restrictions following the authorized hip surgery.
23. There is no evidence to show that plaintiff has made any substantial effort to locate suitable employment on her own or to actively participate in vocational rehabilitation efforts by defendants. Plaintiff has failed to provide any evidence or testimony from a vocational rehabilitation perspective that she will be unable to locate suitable employment at any point in the future.
24. Plaintiff has continued to undergo medical treatment for her compensable work injury, including the future left hip replacement surgery. Both Dr. Gibson and Dr. Gualtieri believe that plaintiff will likely improve significantly after she undergoes left hip replacement surgery. As plaintiff is continuing to seek additional medical treatment and plaintiff needs hip replacement surgery, the undersigned find that plaintiff has not reached MMI.
25. On November 18, 2004, Special Deputy Commissioner Robert J. Harris entered an Order requiring defendants to pay for two appointments with Dr. Issacs on October 12, 2004 and October 19, 2004, to pay dental treatment relating to a May 8, 2004 fall, and to reimburse plaintiff for mileage. On February 28, 2005, defendants filed a motion for reconsideration of the November 18, 2004 Order. On March 4, 2005, plaintiff filed a motion to have Dr. Isaacs *Page 7 
designated as plaintiff's treating physician and for sanctions for defendants' failure to comply with the November 18, 2004 Order. On March 29, 2005, Special Deputy Commissioner Harris denied defendants motion for reconsideration. On May 27, 2005 plaintiff's motion to designate Dr. Isaacs as plaintiff's treating physician was denied, and on May 31, 2005, plaintiff's motion for sanctions was denied.
26. Dr. Gibson nor any of plaintiff's authorized treating physicians had recommended any of plaintiff's unauthorized treatment by Dr. Isaacs. The competent evidence of record shows that the treatment provided by Dr. Isaacs was not necessary to effect a cure, provide relief, or lessen plaintiff's period of disability. Plaintiff has offered no competent testimony that would show that any of the treatments provided by her authorized treating physicians were inappropriate or otherwise deficient in any way that would justify a change in treating physician. Plaintiff has offered no competent medical or other evidence of record to show that there was any medical emergency that would have required immediate treatment by Dr. Isaacs.
27. Neither plaintiff nor defendants have presented sufficient grounds to awarded sanctions in this matter. Plaintiff was unable to show that defendants willfully disregarded an Order of the North Carolina Industrial Commission, which would subject defendants to discretionary sanctions. The greater weight of the evidence shows that defendants did not unreasonably defend this claim.
28. On August 16, 2007, plaintiff filed a motion to authorize the surgeons at the Jordan-Young Institute to perform plaintiff's hip replacement surgery. The undersigned find that the greater weight of the evidence supports the finding that plaintiff's hip replacement surgery is reasonably required to effect a cure, provide relief, or lessen plaintiff's period of disability. *Page 8 
29. On October 19, 2007, the parties requested that plaintiff's Vocational Rehabilitation records in this matter be added to the transcript of the evidence.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Only when an employee has reached MMI does the question of plaintiff's entitlement to permanent disability arise. As plaintiff has not yet reached MMI, the issue of permanent disability is premature in this matter. Effingham v. Kroger, Co., 149 N.C. App 105, 561 S.E. 2d 287
(2002).
2. By acceptance of liability for a workers' compensation claim, the defendants have the right to direct such medical treatment provided to the plaintiff. The right to direct medical treatment includes the right to select the treating physician. Kanipe v. Lane Upholstery,141 N.C. App. 620, 540 S.E.2d 785 (2000). As a general rule, an employer has the right to select a physician to care for an injured employee, and an employee may not procure his own medical treatment at the employer's expense without the employer's knowledge and consent.Ruggery v. N.C. Dept. of Corrections, 135 N.C. App. 270, 520 S.E.2d 77
(1999).
3. There are three exceptions to the employer's general right to direct medical treatment: 1) when the employer has failed to direct medical treatment in a prompt and adequate manner; 2) in the case of an emergency; and 3) if the claimant's selection of a physician is approved by the Industrial Commission. Kanipe v. Lane Upholstery,141 N.C. App. 620, 540 S.E.2d 785 (2000); Lakey v. U.S. Airways,155 N.C. App. 169, 573 S.E.2d 703 (2002). The Commission, however, will not generally approve a change in treating physician if there is no emergency and the treatment by the unauthorized physician was not reasonably required to effect *Page 9 
a cure, provide relief, or lessen the period of disability. Williams v.Benhardt Furniture, Full Commission, I.C. File No. 060900 (2004).
4. Plaintiff's treatment by Dr. Isaacs was not necessary to effect a cure, provide relief, or lessen plaintiff's period of disability. Plaintiff has offered no competent evidence that any of the treatments provided by her authorized treating physicians were inappropriate or otherwise deficient in any way that would justify a change in treating physician. Plaintiff has offered no competent medical or other evidence of record to show that there was any medical emergency that would have required immediate treatment by Dr. Isaacs. N.C. Gen. Stat. § 97-25.
5. Plaintiff's hip replacement surgery is reasonably necessary to effect a cure, provide relief, or lessen plaintiff's period of disability; therefore, upon plaintiff's August 16, 2007 request and pursuant to N.C. Gen. Stat. § 97-25, the Full Commission authorizes plaintiff's hip replacement surgery by the surgeons at the Jordan-Young Institute.
6. In the discretion of the undersigned, there is insufficient evidence to support an award of attorney fees or sanctions. N.C. Gen. Stat. § 97-88.1. N.C.I.C. Rule 802.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's request to assign Dr. Edward Isaacs as the plaintiff's primary treating physician is DENIED.
2. Defendants' Motion for Reconsideration of the November 18, 2004 Order by Special Deputy Commissioner Harris is GRANTED.
3. The undersigned hereby authorize the surgeons at the Jordan-Young Institute to perform plaintiff's hip replacement surgery.
4. Plaintiff's vocational rehabilitation records submitted to the Full Commission on October 19, 2007 are hereby incorporated into the transcript of evidence.
5. Plaintiff's motions for sanctions and attorney fees are DENIED.
6. Defendant's motion for sanctions is DENIED.
7. Each side shall bear its own costs.
This the 31st day of October, 2007.
S/______________________ BUCK LATTIMORE COMMISSIONER
CONCURRING:
 S/______________________ CHRISTOPHER SCOTT COMMISSIONER
 S/______________________ PAMELA T. YOUNG CHAIR *Page 1